BOISEN *v.* COBBS & MITCHELL.

CARRIERS—PASSENGERS—PERSONAL INJURIES—PRIVATE CARRIERS
—AGENCY OF CONDUCTOR—RISKS ASSUMED BY PASSENGER.

A manufacturing corporation operating a logging railroad,
which does not solicit passengers, has no passenger cars, and
maintains no train schedules, and which has instructed its
conductors not to carry passengers elsewhere than in the
caboose, and is not aware of violations of its rule, owes no
duty to a passenger to provide for his safety while riding on
a flat car, though he takes his position by direction of the
conductor to finish his journey after having contracted to be
carried in the caboose to his destination.

Error to Charlevoix; Mayne, J. Submitted October
11, 1906. (Docket No. 61.) Decided March 12, 1907.

Case by Nels Boisen against Cobbs & Mitchell for per-
sonal injuries. There was judgment for plaintiff, and de-
fendant brings error. Reversed.

*Crane & Norris*, for appellant.

*J. M. Harris*, for appellee.

BLAIR, J. Defendant corporation is organized for "the
purchase, manufacture, and sale of all kinds of forest
products and the utilization of the waste thereof, the manu-
facture and sale of salt and the buying and selling of all
kinds of merchandise." As an incident to its business, it
operates a logging railroad, upon the main line of which
it authorizes the conductors of its trains to receive passen-
gers for hire, and furnishes them with tickets or slips to
be given to passengers upon payment of fare. Defendant
has no passenger cars, and its instructions are that pas-
sengers must ride in the caboose, and not elsewhere. It
does not solicit passenger traffic, has no train schedule,
and the movement of its trains is governed solely by the

demands of its private business. The conductors are expressly instructed not to accept passengers for points on the branches from the main line running into the lumber camps.

On September 13, 1904, plaintiff entered the caboose to take passage to Camp 29 on defendant's Petoskey branch to deliver some clothing to its employés there. The train was composed of a locomotive, a caboose, a trailer, and four flat bark cars. The conductor collected plaintiff's fare.

" I asked him if he was going to Camp 29. He said he was going right over there. He said that the caboose was going over. I gave him $1 and he gave me 75 cents back."

About half a mile from Camp 29 the' caboose was switched in onto another track, and plaintiff was informed by the conductor that, if he wanted to proceed to Camp 29, he would have to ride on 'a certain flat car, which the conductor pointed out to him. Plaintiff got upon the car indicated, which was the farthest car from the engine which was pushing the train, but was the first car of the train in the direction of Camp 29. The conductor sat upon the same car with the plaintiff, and near to him. Near the switch where the caboose was left, there is a rising grade for a short distance, and the grade then descends towards Camp 29. After the train had reached the top of the grade, and was just descending, the train broke in two, the car upon which plaintiff was riding collided with a box car standing on the track, and he was seriously injured. The train was running at the rate of about four miles an hour. The conductor jumped and shouted, and motioned to plaintiff to jump. Plaintiff did not understand the conductor, and did not realize the danger he was in till too late to save himself. Immediately after the accident the draught iron of one of the flat cars was found on the track near where the train broke in two. The key which goes through a slot in the end of the draught iron and the ring which is inserted in a hole in

the lower end of the key for the purpose of holding the draught iron in place were not found. About a month before the accident plaintiff and a companion had ridden over this Petoskey branch on a flat car with the same conductor from Camp 23, on the main line, to Camp 29 and back again, and had paid 10 cents each for fare. Excursions are run from time to time over this road. On Saturdays the company carries men free who desire to trade at its store in Springvale. Conductors were required to account to the office at the end of the month for money collected from fares. They kept such money in a place by itself, but kept no record of it at all. The conductors turn the money that they collect into the office at Boyne Falls, and from there it goes to Cadillac. There is an account kept of it by the company.

The court submitted the case to the jury under the second count of the declaration, alleging that it was the duty of the defendant—

" To furnish plaintiff with a reasonably safe car on which to ride, and to reasonably equip and operate its said train so that it might and would be safe for plaintiff to ride thereon, * * * yet the said defendant negligently and carelessly disregarding its said duties, did not then and there furnish the plaintiff with a safe place to ride, and did not then and there carefully and prudently and safely furnish, equip, and operate its said train, but, on the contrary, by its said officers and agents, proceeded to and did carelessly and negligently undertake to carry said plaintiff upon a train with faulty and imperfect couplings between the cars composing said train, and which would and did uncouple by the operation of said train," etc.

By motions to direct a verdict and for a new trial, and by exceptions and proper assignments of errors, defendant raises questions stated by its counsel as follows:

" 1. Was the plaintiff a passenger at the time of the accident ?

" 2. Was there any evidence of negligence on the part of the defendant ?

" 3. Was the risk of injury assumed by the plaintiff ?

"4. Was the plaintiff guilty of contributory negligence?

"5. Was it the duty of the defendant to safely carry the plaintiff on its branch road to Camp 29?

"6. Was it error to exclude the evidence offered by the defendant?

"7. Was the argument of plaintiff's counsel reversible error?

"8. Should the motion for new trial have been granted?"

We are of the opinion that a verdict should have been directed for the defendant. Under the circumstances of this case the defendant owed no duty to the plaintiff to provide for his safety when riding elsewhere than in the caboose, and he must be held to have assumed the risk of any injury which occurred to him in consequence of his riding on the flat car. It is conceded that defendant was not a common carrier of passengers, and the court so instructed the jury. Defendant was under no obligation to receive and carry any particular person as a passenger, or to carry passengers at all. If it chose to carry passengers, it had a right to determine where they should ride. It had determined in this case that passengers should be carried in the caboose alone, and not elsewhere, and had so instructed its conductors. The case is barren of evidence that defendant knew that its instructions were disobeyed, and that passengers were, even occasionally, carried on flat cars. That there was actual notice to defendant is not claimed, and the fact that plaintiff and a companion had once ridden upon a flat car falls far short of charging the defendant with notice of such a practice. The fact that the company received from its conductors money, a portion of which had been paid by persons riding on flat cars, was no evidence of notice to the company in the absence of some evidence to indicate its improper source. There is no such evidence in the record.

The plaintiff's contract, as stated by himself, was that he was to be carried in the caboose to his destination. It might well be held that this contract was within the scope

of the conductor's agency, since he was authorized to and did carry passengers in the caboose on defendant's railroad, and limitations of his authority to particular parts of the road were not known to plaintiff. But the conductor's direction to plaintiff to finish his journey upon the flat car was not within the scope of his agency. He was expressly prohibited from allowing passengers to ride upon the flat cars. The defendant did not permit passengers to ride upon its flat cars upon any part of its road. The flat cars were not designed for or adapted to the carriage of passengers, but for hauling logs, bark, and other products of defendant's principal business. They were, in themselves, notice to all who saw them that they were not intended for the carriage of passengers, and the act of the conductor in directing the plaintiff to ride upon the flat car was obviously outside of the apparent, as well as the actual, scope of his agency. The case of *Greenfield* v. *Railway Co.*, 133 Mich. 557, is distinguishable from the present case, in that the defendant was a common carrier of passengers, and there was evidence that defendant had waived its rule forbidding the carrying of passengers on freight trains without a permit. The judgment in the present case can only be sustained by holding that the agent had authority to bind his principal because the act was within the scope of his employment.

We are also of the opinion that, if the plaintiff had otherwise made a case, there was not sufficient evidence of negligence on the part of the defendant to authorize the submission of that question to the jury. Defendant put in testimony tending to show an inspection in the morning of the day in question of the car whose draught iron pulled out, and that the draught iron apparatus was in proper condition. The cross-examination of the inspector tended to discredit his testimony that he made an inspection. Assuming that the jury would be warranted in discarding his testimony, there would be no direct evidence in the case as to the condition of the draught iron apparatus at the time plaintiff entered upon his journey.

Neither was there any circumstantial evidence as to the condition of the apparatus at that time, unless the fact that the key and ring were missing was such evidence. It is conceded that the key must have been in its place up to the time that the caboose was switched out and left, since, otherwise, the car in question would not have followed the engine. It is contended, however, that it does not follow that the ring was in its place, and that there was no proof of any unusual concussion to account for breaking the key. As stated by plaintiff's counsel:

"There was no jerk, no rapid running to break the key, and the key was not found by any of the witnesses, and was not produced upon the trial, although the roadbed was '*clear as the carpet*' on the floor. If the key had been in there and secured, as it was designed to be, it could not have come out. There was no extra jerk or pull; in fact, no pull, but a slight one, to break it. The ordinary mind, from these circumstances, can conclude but one of two things: Either the key was not in its place and secure, or, if there, it was so worn or split as not to have strength enough to haul these three empty flat cars, and an ordinarily careful inspection would have shown this."

The only evidence as to a search for the key and ring limits the search to the track between the point of collision and the top of the hill, and the fact that no trace of them was found there indicates that the key must either have pulled out from lack of a ring to hold it in place, or have been broken between the top of the hill and the switch where the caboose was left. The engineer testified that he set the brake on his engine before pushing the cars up the grade from the switch.

"And, when I set the brake there, the slack ran out, and the recoil from the springs, of course, they came back again, so that everything was in complete working order at that time.

"*Q.* What was your idea in setting the brake on that occasion?

"*A.* Why, of course, to stop my train and to see that my brake was working all right before I went up that hill.  *  *  *

"*Q.* Now, in the operation of the train with this key through the end of the pin, as it would be when in proper position, any force applied to the train to separate the drawhead from the car—drawhead and pin from the cars by cutting off of the key or the breaking out of the hole in the pin—whether or not it would cause such a jar or pull upon the train as to make the motion perceptible on the engine?

"*A.* Why, I have seen these keys break before now when you would take a hard pull on them, and they would, apparently, be all right with you, the least little jerk would break them. In the course of time they will crystallize, the same as other iron will crystallize, and it is liable to snap right off. Then, again, it will wear a long time. It crystallizes the same as any shaft in the mill will crystallize in a box and break.

"*Q.* How long, in your judgment, will a key, or piece of iron used as a key in the end of a draw pin, continue in that position at the ordinary work and usage that it receives—remain before this crystallization that you speak of takes place?

"*A.* That is a very hard question to answer.

"*Q.* Well, there is a minimum length of time and a maximum?

"*A.* Well, not that I really know, sir; but I have had experience with different pieces of steel and I have seen them crystallize in a very short time; then, again, they would run for years before they would crystallize.

"*Q.* When this crystallization takes place, is it apparent to a person of experience in the handling of steel or iron?

"*A.* No; it is not. There can't any one tell when it crystallizes, unless it opens a break. Then it shows in a certain way that it is crystallized.

"*Q.* Could that be tested by taking it and pounding it —testing it with a hammer?

"*A.* Well, that might be all right if they would take it out and test it.

"*Q.* When you say you have seen it break in a very short time, what would you call a short time?

"*A.* Oh, three or four months."

The plaintiff's declaration does not allege a negligent failure to perform the duty of inspection, but charges negligence in undertaking to carry plaintiff upon a train

with faulty and imperfect couplings between the cars, which would uncouple by the operation of the train. But failure to inspect would not render the defendant liable, unless there was proof of some defect which such inspection would have disclosed. Whether the key pulled out because there was no ring in it when the trip commenced; whether the ring spread or broke on the trip, so that the key could work out; whether the key was worn and weak or the metal crystallized, and it broke when the engineer set his brake and afterwards worked out—are questions for speculation, but questions to which the testimony presents no definite answer. We do not think the testimony justifies a reasonable inference that the couplings were defective in any specific particular which defendant ought to have discovered. The circumstances show that the absence of the key and ring may have occurred consistently with the performance of duty, and negligence cannot be inferred from such absence. *Perry* v. *Railroad Co.*, 108 Mich. 130; *Robinson* v. *Charles Wright & Co.*, 94 Mich. 283; *Hall* v. *Murdock*, 114 Mich. 233; *Hennig* v. *Foundry Co.*, 112 Mich. 616; *Griffen* v. *Manice*, 166 N. Y. 188 (52 L. R. A. 922); *Kincaid* v. *Railway Co.*, 22 Or. 35.

The judgment is reversed, and a new trial granted.

GRANT, J., concurred with BLAIR, J. MONTGOMERY, OSTRANDER, and HOOKER, JJ., concurred in reversal on the first point discussed.